**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

ASTRAZENECA PHARMACEUTICALS LP,

*Plaintiff*,

*v.*

PHILIP J. WEISER, in his official capacity as
the ATTORNEY GENERAL OF THE STATE
OF COLORADO, et al.,

*Defendants*.

Civil No. 25-cv-2685-PAB

**<u>PLAINTIFF'S MOTION FOR A
PRELIMINARY INJUNCTION</u>**

**HEARING REQUESTED**

Section 340B of the federal Public Health Service Act, 42 U.S.C. § 256b, requires participating pharmaceutical manufacturers to "offer" their products at steeply discounted rates to an enumerated and clearly defined list of providers known as "covered entities." Access to these 340B discounts is costly to manufacturers, and Congress carefully limited the circumstances in which such discounts must be made available. A number of manufacturers, including plaintiff AstraZeneca Pharmaceuticals LP, successfully sued the federal government to establish that Section 340B does not require them to offer discounts for drug sales at unlimited commercial pharmacies that contract with covered entities (known as "contract pharmacy sales").

After Colorado unsuccessfully argued that *federal law* requires manufacturers to offer 340B discounts for unlimited contract pharmacy sales, *see* Br. of Amici Curiae States, *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452 (D.C. Cir. 2024) (No. 21-5299), 2022 WL 1644996, at *2, the State enacted a statute imposing the very same requirement as a matter of *state law*. Known as SB 71, Colorado's law prohibits manufacturers from "limit[ing] the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B covered entity, a pharmacy contracted with a 340B covered entity, or a location otherwise authorized by a 340B covered entity to receive and dispense

340B drugs." SB 71 § 6-29-105(1)(a) (to be codified at Colo. Rev. Stat. §§ 6-1-105, 6-29-101 to -105, and 25-3-132). SB 71 thus requires manufacturers who participate in the federal 340B program to offer their drugs at 340B-discounted prices for unlimited contract pharmacy sales.

Colorado's attempt to expand the category of sales for which manufacturers must offer 340B discounts violates the Supremacy Clause in two ways, and AstraZeneca accordingly asks this Court to preliminarily enjoin enforcement of SB 71 against AstraZeneca.

*First*, SB 71 is preempted by Section 340B. The new obligations and restrictions imposed by Colorado's law apply to a manufacturer if, and *only* if, it participates in the federal 340B program. But no State may engraft costly new obligations under state law onto an existing federal benefits program—especially not one, like the 340B program, that adopts nationally uniform standards and mandates exclusive enforcement by federal agencies. Nor may States insert restrictions into a federal program, like SB 71's prohibition on collecting claims data, that directly prohibit program participants from exercising rights that federal law grants them.

*Second*, as applied to AstraZeneca's patented products, SB 71 is preempted by federal patent law. Federal patent law "prohibits states from regulating the price of patented goods." *Biotechnology Industry Organization (BIO) v. District of Columbia*, 496 F.3d 1362, 1372 (Fed. Cir. 2007). Yet SB 71 does precisely that: It dictates the price at which AstraZeneca must offer its patented drugs, by requiring it to make 340B discounts available for unlimited contract pharmacy sales. SB 71 thereby extends federal price controls to a category of patented drug sales (contract pharmacy sales) for which federal courts have held that price controls do *not* otherwise apply.

AstraZeneca seeks an order: (1) declaring that SB 71 is preempted by Section 340B; (2) declaring that SB 71 is preempted by federal patent law as applied to AstraZeneca's patented products; and (3) enjoining Defendants from enforcing SB 71 against AstraZeneca.

## RELEVANT FACTS AND BACKGROUND

**A.** Section 340B "imposes ceilings on prices drug manufacturers may charge for medications sold to specified health-care facilities," known as covered entities, that provide healthcare to certain underserved populations. *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 113 (2011). As a condition of receiving reimbursement for its drugs under Medicaid and Medicare Part B, a manufacturer must enter into a pharmaceutical pricing agreement with the HHS Secretary that requires a manufacturer "offer each covered entity covered outpatient drugs for purchase" at prices substantially discounted under a statutory formula. 42 U.S.C. § 256b(a)(1).

Congress originally intended for the 340B program to benefit underserved communities by allowing covered entities to pass on the low prices required by Section 340B, called "340B prices," to the "low-income and rural persons" for whom they offer care. *Sanofi-Aventis U.S. LLC v. HHS*, 58 F.4th 696, 699 (3d Cir. 2023). That is how the program worked originally. But over time, covered entities realized that if they *did not* pass on the full 340B discount, they could use the program to generate arbitrage "revenue": Covered entities "turn a profit when insurance companies reimburse them at full price for drugs that they bought at the 340B discount." *Id.* Congress limited the reach of the program by delineating fifteen specific categories of covered entities to whom manufacturers must offer 340B prices. 42 U.S.C. § 256b(a)(4)(A)-(O). Notably, contract pharmacies are *not* "covered entities" under the statute.

In 1996, however, the Health Resources and Services Administration (HRSA), issued guidance purporting to authorize covered entities to enter into agreements with contract pharmacies to dispense 340B-discounted drugs, stating that "eligible covered entities that do not have access to appropriate 'in-house' pharmacy services" could enter into an agreement with a *single* outside pharmacy of its choice ("only one site") to provide such services for 340B drugs.

61 Fed. Reg. 43,549, 43,555 (Aug. 23, 1996) (1996 Guidance). Then, in 2010, HRSA released

new guidance permitting covered entities to "use multiple pharmacy arrangements"—that is, an

*unlimited* number of contract pharmacies, without any geographic limits—"as long as they comply

with guidance developed to help ensure against diversion and duplicate discounts and the policies

set forth regarding patient definition." 75 Fed. Reg. 10,272, 10,273 (2010 Guidance). The 2010

Guidance prompted an explosion in 340B discounts accessed for contract pharmacy sales, with the

number of contract pharmacies growing exponentially, enabling outsized profit margins from the

resale of these discounted drugs at full price to insured patients. *See* Am. Compl. ¶ 33.

Although contract pharmacy sales occur in the name of the covered entity, they do not

resemble a normal commercial purchase. Covered entities do not maintain title to 340B drugs, and

contract pharmacies are typically independent contractors, *not* agents of covered entities, with

respect to the acquisition and sale of 340B drugs. *Id.* ¶ 46. As the D.C. Circuit has explained:

> While some contract pharmacies maintain separate inventories of section 340B drugs, most fill prescriptions from inventories that intermingle discounted and non-discounted drugs. Only after dispensing the drugs do these pharmacies attempt to discern whether individual customers were patients of covered entities—in other words, whether individual prescriptions were eligible for the discount. Many pharmacies outsource this determination to third-party administrators, who often receive a larger fee for every prescription deemed eligible for the discount. Once the pharmacy or the administrator categorizes a certain number of prescriptions as eligible, the pharmacy places an order to replenish its section 340B purchases. The covered entity, the pharmacy, and the third-party administrator often divvy up the spread between the discounted price and the higher insurance reimbursement rate. Each of these actors thus has a financial incentive to catalog as many prescriptions as possible as eligible for the discount.

*Novartis Pharms.*, 102 F.4th at 457. In other words, a contract pharmacy sale usually just involves

a normal sale that is initially conducted at full commercial prices (paid by a pharmacy customer or

his insurer), followed by an after-the-fact determination of program eligibility and a request to

"replenish" the dispensed drugs at 340B-discounted prices. This means the 340B discount gets

applied *on top of* the full insurance reimbursement. Thus, the result under this so-called

"replenishment" model is significant arbitrage revenue, which the contract pharmacy divvies up with its covered entity and third-party administrator partners. Am. Compl. ¶¶ 34-39.

**B.** In August 2020, to combat the rise of contract pharmacy abuse, AstraZeneca announced that, effective October 1, it would continue to offer unlimited 340B discounts to covered entities; but for each covered entity that lacked its own in-house pharmacy, AstraZeneca would also offer 340B discounts for sales at a single designated contract pharmacy, and AstraZeneca would no longer offer 340B discounts for unlimited contract pharmacy sales. *Id.* ¶¶ 50-61. AstraZeneca later updated its policy to require covered entities report a limited set of claims data for contract pharmacy dispenses that were replenished using 340B-priced drugs. *Id.* ¶ 69. AstraZeneca's policy enables all covered entities and their patients to continue to access AstraZeneca's medicines at 340B prices. Under AstraZeneca's policy, over 13,000 covered entities that lack an on-site pharmacy have registered a contract pharmacy, including numerous covered entities in Colorado. Decl. of Chris Mancill (Mancill Decl.) ¶ 20 (a true copy of which is attached hereto as Exhibit A).

In December 2020, HHS issued an Advisory Opinion asserting that the 340B statute requires manufacturers to make 340B discounts available for unlimited contract pharmacy sales. *Sanofi*, 58 F.4th at 701. AstraZeneca challenged that Advisory Opinion—and a related "violation letter" sent by HRSA—in federal district court. *Id.* at 702. On appeal, Colorado and other States submitted an amicus brief supporting the federal government, arguing that manufacturers have a "statutory obligation to offer safety-net providers 340B-discounted prices on critical prescription drugs" via unlimited contract pharmacy sales, which "allow[] covered entities to generate significant revenue." *Novartis* Amici Br. at 2, 4.

The Third Circuit held that the Advisory Opinion and the associated violation letter were "unlawful," and it "enjoin[ed] HHS from enforcing against AstraZeneca" its "reading of Section

340B." *Sanofi*, 58 F.4th at 706. In 2024, the D.C. Circuit "reject[ed] [the] position that section 340B prohibits drug manufacturers" from restricting discounts for unlimited contract pharmacy sales. *Novartis Pharms.*, 102 F.4th at 461. The D.C. Circuit also ruled that Section 340B permits manufacturers to condition their offer of 340B-discounted medications on the submission of reasonable claims data, the "burden" of which is "minimal." *Id.* at 463 (citation omitted).

**C.** SB 71 went into effect on August 6, 2025. It expressly identifies the federal 340B program as its regulatory object: The title of the new statutory chapter is "Colorado 340B Contract Pharmacy Protection Act," and the statute defines its key terms—"340B drug" and "340B covered entity"—by direct reference to 42 U.S.C. § 256b. *See* SB 71 § 6-29-103(1), (2). The operation and apparent intent of SB 71 is to compel pharmaceutical manufacturers to make 340B discounts available for sales at an unlimited number of contract pharmacies. Under the law, a drug manufacturer "shall not, directly or indirectly, deny, restrict, prohibit, discriminate against, or otherwise limit the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B covered entity, a pharmacy contracted with a 340B covered entity, or a location otherwise authorized by a 340B covered entity to receive and dispense 340B drugs." *Id.* § 6-29-105(1)(a). Because a "340B drug" is a drug purchased at a discount under the 340B program, *see id.* § 6-29-103(2), a manufacturer violates the law by refusing to offer its products at 340B-discounted prices to each and every pharmacy under a "contract[] with a 340B covered entity," *id.* § 6-29-105(1)(a)—that is, unless it offers 340B discounts for *unlimited* contract pharmacy sales.

Although the 340B program is administered by a federal agency (HRSA), SB 71 does not account for HRSA's enforcement authority or Section 340B's administrative dispute resolution procedure. Instead, manufacturers that violate the law face a $20,000 fine per violation. *See* SB 71 §§ 6-1-105, 6-29-105(3)(a); Colo. Rev. Stat. § 6-1-112(1)(a). Additionally, SB 71 empowers the

Colorado State Board of Pharmacy to "discipline" regulated entities for violating the statute. SB 71 § 6-29-105(3)(d). The Board may "[d]eny, suspend, or revoke licenses, certifications, or registrations" and "obtain restraining orders and injunctions" to enforce SB 71. Colo. Rev. Stat. § 12-280-108(1)(c)-(d). Finally, the statute incorporates the private right of action created by the Colorado Consumer Protection Act, *see id.* § 6-1-113, permitting any person to sue for damages stemming from alleged violations of SB 71, *see id.* § 6-1-102(6).

## ARGUMENT

In issuing a preliminary injunction, a district court considers (1) whether the movant is likely to succeed on the merits; (2) the threat of irreparable harm to the movant; (3) the state of balance between this harm and the injury that granting the injunction will inflict on other parties; and (4) the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Pryor v. Sch. Dist. No. 1*, 99 F.4th 1243, 1250 (10th Cir. 2024). AstraZeneca satisfies each factor here. SB 71 is preempted both by Section 340B and by federal patent law. Absent relief, AstraZeneca faces severe and irreparable harm, including unrecoverable economic damage. The balance of the equities and public interest also favor an injunction. A preliminary injunction is warranted.

## I.    ASTRAZENECA IS LIKELY TO PREVAIL IN CHALLENGING SB 71

AstraZeneca's Complaint states two separate preemption claims—under Section 340B and the federal patent law—either of which is sufficient for the Court to determine that Defendants cannot enforce SB 71 against AstraZeneca. Two considerations apply to both preemption claims.

***First***, no presumption against preemption of state law is appropriate here. While a presumption applies in disputes "implicating federalism concerns and the historic primacy of state regulation of matters of health and safety," *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348 (2001) (cleaned up), this is not such a case. No presumption applies when a State attempts to

regulate something "inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law." *Id.* at 347. AstraZeneca's obligations towards 340B covered entities originate from Section 340B; are governed by Section 340B; and will terminate when AstraZeneca no longer participates in the Section 340B program. 340B sales are thus "uniquely federal" and beyond the States' traditional police power. *Id.* (cleaned up).

As its formal name suggests ("Colorado 340B Contract Pharmacy Protection Act"), SB 71 directly targets—and in fact is entirely parasitic on—federal law. The law defines all of its key terms, including "340B covered entity" and "340B drug," in terms of their meaning and operation under "42 U.S.C. sec. 256b." SB 71 § 6-29-103(1), (2). Indeed, SB 71's *only* function is to regulate transactions under the 340B program that are engaged in by participants in the 340B program. If Section 340B were to be repealed, SB 71 would cease to have any effect.

To be sure, state law has historically provided a "complementary form of drug regulation," including a "layer of consumer protection that complements [federal] regulation." *Wyeth v. Levine*, 555 U.S. 555, 578-79 (2009). But those generally applicable laws regulate the sale and distribution of *all* drugs, not just drugs sold within a federal program. SB 71 is different. It targets sales of 340B drugs (not all drugs) in transactions involving pharmacies that contract with 340B covered entities (not all providers). AstraZeneca is aware of no other context where a presumption against preemption was applied to a law that had no effect other than to regulate the relationship between participants in a federal program—indeed, none where such a state regulation was even *attempted*.

***Second***, SB 71 regulates drug *pricing*, not distribution: On its face, the law regulates the price that manufacturers may charge in sales to contract pharmacies.

Start with the text. SB 71 identifies the drugs that it regulates *solely* in terms of their price. A "340B drug" is a "covered outpatient drug within the meaning set forth in 42 U.S.C. sec. 256b"

that "has been subject to any offer for reduced prices by a manufacturer pursuant to 42 U.S.C. sec. 256b (a)(1)" and "is purchased by a covered entity." SB 71 § 6-29-103(2). "[A] drug is considered 'purchased' if it would have been purchased but for [a] restriction or limitation" prohibited by the new statute. *Id.* § 6-29-103(2)(c). The statute requires manufacturers to make "340B drug[s]"—that is, drugs discounted under the federal Section 340B program—available to any "pharmacy contracted with a 340B covered entity, or a location otherwise authorized by a 340B covered entity to receive and dispense 340B drugs." *Id.* § 6-29-105(1)(a). The only way to comply with the law is to offer 340B-discounted pricing for unlimited contract pharmacy sales; a manufacturer's attempt to use a *different* (market-based) price for contract pharmacy sales violates the statute. Simply put, a law that forbids charging too much is a law that regulates pricing.

Nor does SB 71 regulate drug acquisition or delivery. AstraZeneca's drugs are available for purchase and acquisition by any covered entity, or for delivery to "any pharmacy" in Colorado (albeit not always at 340B prices). Mancill Decl. ¶ 22; *see id.* ¶ 24 (AstraZeneca's drugs are still available "at commercial prices"). AstraZeneca's policy also does not affect the delivery of AstraZeneca drugs that have actually been purchased: No covered entity in Colorado has "ever purchased an AstraZeneca drug at a 340B price for sales at a non-designated contract pharmacy but had AstraZeneca (or a wholesaler) refuse delivery of that drug." *Id.* ¶ 23. Instead, AstraZeneca's policy means "[c]overed entities are not offered—and are thus unable to purchase—AstraZeneca's drugs at 340B prices for sales at non-designated contract pharmacies." *Id.* ¶ 24.

Even if SB 71 could be viewed as addressing acquisition and delivery in some respect, moreover, that *still* would not change its character as a price regulation. There is no meaningful difference between a statute requiring the sale of goods to identified buyers at a specified price ("You must sell me a car for $1"), and a statute mandating delivery of the same goods at that same

price to the same buyers ("You may not deny me delivery of a $1-priced car."). Either way, the statute's sole effect is to require manufactures to make *discounted pricing* available.

"Preemption is not a matter of semantics," and a State cannot avoid preemption "by resorting to creative statutory interpretation or description at odds with the statute's intended operation and effect." *Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627, 636 (2013). In *Engine Manufacturers Ass'n v. South Coast Air Quality Management District*, for instance, federal law prohibited States from "adopt[ing] or attempt[ing] enforcement" of state standards for motor-vehicle emissions." 541 U.S. 246, 251 (2004). Yet California issued regulations "prohibit[ing] the purchase or lease" of noncompliant vehicles, arguing that federal law allows the imposition of emission standards in this way. *Id.* at 248-49, 253-54 (emphases added). The Supreme Court rejected that argument as "meaningless" semantics: "treating sales restrictions and purchase restrictions differently for pre-emption purposes would make no sense." *Id.* at 255. Similarly, SB 71 does not merely govern the "delivery" of 340B-discounted drugs—any more than California law merely governed "sales." SB 71 requires the availability of drugs at the 340B-discounted price, a mandate that—in substance, operation, and effect—functions as a price regulation.

The replenishment model used by contract pharmacies makes this especially clear. Under that model, contract pharmacies "fill prescriptions from inventories that intermingle discounted and non-discounted drugs." *Novartis Pharms.*, 102 F.4th at 457. The pharmacy dispenses these drugs to *any* patient, 340B-eligible or not. "Only after dispensing the drugs do these pharmacies attempt to discern whether individual customers were patients of covered entities—in other words, whether individual prescriptions were eligible for the discount." *Id.* After determining eligibility, "the pharmacy places an order" from the manufacturer at "the discounted [340B] price," which it uses to "replenish" its inventory (where 340B and non-340B drugs are again intermingled). *Id.*

10

"Because the drug is already in the hands of the contract pharmacy even before the patient arrives at the pharmacy, the question is not about delivery of the drug." *PhRMA v. Morrisey*, 760 F. Supp. 3d 439, 455 (S.D. W.Va. 2024). Instead, "[t]he question is only about what price the pharmacy and the covered entity will pay the manufacturer for the replenished drug upon distribution of the 340B Program eligible one." *Id.* Thus, the actual *distribution* (*i.e.*, movement) of 340B drugs is no different from non-340B drugs; and the *acquisition* of those drugs differs only in terms of their prices. *Id.* ("[T]he system is about delivery *at a given price*, not delivery *per se*.").

## A.    SB 71 Is Preempted by Section 340B

**1.** A state law is preempted if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (citation omitted); *accord In re MDL 2700 Genentech Herceptin (Trastuzumab) Mktg. & Sales Pracs. Litig.*, 960 F.3d 1210, 1230 (10th Cir. 2020). In enacting Section 340B, Congress carefully balanced the benefits and burdens of participation in the 340B program, such that manufacturers knew what they were agreeing to when they agreed to participate. SB 71 recalibrates the "burden" side of the scale, upending Congress's careful calculus.

By extending 340B-discounted pricing to unlimited contract pharmacy sales, SB 71 substantially increases manufacturers' costs of participating in the 340B program. Prior to the law's enactment, manufacturers were required to offer 340B discounts only for a limited category of sales directly to covered entities, which covered entities used to "turn a profit." *Sanofi*, 58 F.4th at 699. SB 71 now requires them to make 340B discounts available for an additional category of transactions as well (unlimited contract pharmacy sales), even though the 340B statute itself "does not require" it. *Id.* at 703. Requiring discounts for those additional sales enables covered entities to "squeeze [more] revenue out of" the 340B program, *id.* at 704, but only at the direct expense of

11

manufacturers—from whom the revenue is "squeeze[d]"—substantially changing costs of participating. As a result of SB 71, AstraZeneca must now make products like Farxiga and Xigduo, which retail for hundreds of dollars, available for unlimited contract pharmacy sales at prices of less than a dollar. Mancill Decl. ¶ 13. Complying with that requirement will result in approximately $600,000 dollars per month in losses for AstraZeneca. *Id.* ¶ 28. Colorado has used manufacturers' participation in the federal 340B program as leverage to extract additional money from them under state law, "exert[ing] an extraneous pull on the scheme established by Congress," thus "skew[ing]" the "delicate balance of statutory objectives." *Buckman*, 531 U.S. at 348, 353.

In Colorado's *Novartis* amicus brief, the State argued that manufacturers like AstraZeneca who adopted one-contract-pharmacy policies were "flout[ing] their statutory obligation to offer safety-net providers 340B-discounted prices on critical prescription drugs." 2022 WL 1644996, at *2. In doing so, the State argued, these manufacturers were preventing covered entities from engaging in transactions "yield[ing] significant savings and revenue." *Id.* at *3. But every additional dollar that SB 71 helps covered entities generate in so-called "savings and revenue" makes it a dollar more expensive for manufacturers to participate the 340B program—and hence for them to participate in other federal programs (Medicare and Medicaid) with which Section 340B is "interdependent." *Astra USA*, 563 U.S. at 120 (citation omitted).

Indeed, SB 71's interference with federal objectives is unusually clear, because it specifically targets federal law—applying *only* to 340B participants, *only* to 340B drugs, and *only* to pharmacies that contract with 340B-covered entities. It is one thing for a State to impose generally applicable requirements on everyone operating statewide. For instance, States can impose generally applicable licensing requirements on doctors, regardless of their participation in Medicare and Medicaid. But a State may not impose requirements *solely* on participants in a

federal benefits program. By imposing costly new requirements on manufacturers who choose to participate in the 340B program, SB 71 upsets Congress's calibration of burdens and benefits.

**2.** SB 71's disruptive effect on federal priorities is especially strong because if Colorado may add to the burdens of participating in a federal benefits program, then so may any other state. Indeed, more than twenty states have already passed similar laws. A manufacturer deciding whether to participate in the 340B program (and in Medicare and Medicaid, with which it is intertwined) would have to consider, not merely what participation would cost under the federal programs themselves, but also under all of those separate state laws.

Worse still, each of these state laws, while similar, is slightly different—creating a hodgepodge of overlapping obligations, burdens, enforcement mechanisms, and penalties. This delegation of enforcement powers to individual states frustrates Congress's goal of a national, uniform 340B program. When it enacted Section 340B, Congress "centralized" enforcement of its "unitary administrative and enforcement scheme," so that HHS could "administer both Medicaid and § 340B harmoniously and on a uniform, nationwide basis." *Astra USA*, 563 U.S. at 119-20 (citation omitted). Congress intended for manufacturers' obligations under the program to be defined by federal law, as interpreted by federal courts and enforced by federal officials. "With HHS unable to hold the control rein"—as is true here, with Colorado asserting its own control— "the risk of conflicting adjudications would be substantial." *Id.*

The 340B statute contains a robust federal enforcement regime. 42 U.S.C. § 256b(a)(5), (d)(1), (d)(3). *Astra USA* held that private entities may not bring actions under state law to enforce the provisions of manufacturers' 340B pharmaceutical pricing agreements. 563 U.S. at 113-14. "Congress made HHS administrator of … the 340B Program," and suits by private entities "would undermine the agency's efforts" to administer the program "harmoniously and on a uniform,

nationwide basis." *Id.* at 120. That holding equally precludes state legislation purporting to impose new requirements under the 340B program. Indeed, it would be bizarre for state officials to have *more* leeway than federal officials to impose requirements on participants in the program.

Yet SB 71 establishes a parallel state enforcement regime, one that encroaches on the federal government's authority to set and define federal enforcement priorities. SB 71 authorizes the Colorado Attorney General and district attorneys to bring civil actions to enjoin violations and recover penalties. *See supra* p. 6-7. In any state enforcement proceeding, a state adjudicator would be required to consider and resolve questions of federal law in order to determine whether a manufacturer has violated the statute. Among other things, the adjudicator would need to decide whether the 340B drugs to which the manufacturer allegedly denied or restricted access were intended for "a patient of the entity," as required for eligibility under the 340B program, 42 U.S.C. § 256b(a)(5)(B), a question that turns on the definition of the term under federal law. The adjudicator would also need to determine whether a particular covered entity continues to qualify for participation in the 340B program, which depends on whether the entity sells or transfers 340B-priced drugs to anyone other than its patients or seeks duplicate discounts. *See id.* § 256b(a)(4). Notably, these very issues are often disputed and have been the subject of federal litigation. *See, e.g., Amgen Inc. v. Becerra*, No. 1:24-cv-3571 (D.D.C. filed Dec. 20, 2024); *Albany Med Health Sys. v. HRSA*, No. 1:23-cv-3252 (D.D.C. filed Oct. 31, 2023).

**3.** Indeed, SB 71 *directly* cuts off manufacturers' access to the federal enforcement regime. The law's claims-data restriction prohibits manufacturers from requiring covered entities and contract pharmacies to submit any "claims or utilization data, purchasing data, payment data, or other data that does not relate to a claim submitted to a federal health care program." SB 71 § 6-29-105(1)(b). But "manufacturers are required to audit a covered entity prior to filing an ADR

claim." 89 Fed. Reg. 28,643, 28,644 (Apr. 19, 2024); *see* 42 U.S.C. § 256b(d)(3)(B)(iv). And

before auditing, manufacturers must first "ha[ve] documentation" from the covered entity or

pharmacy that tends to show that a "covered entity may have violated" the prohibitions on

diversion or duplicate discounting, 61 Fed. Reg. 65,406, 65,409 (Dec. 12, 1996). SB 71's claims-

data restriction thus collides squarely with the federal regime: "By restricting the very method by

which data collection is made," SB 71 "frustrates drug manufacturers' ability to take the initial

steps necessary to start the very audit required to access the alternative dispute resolution system."

*Morrisey*, 760 F. Supp. 3d at 453 (finding that a similar "no-audit" provision unconstitutionally

"stands as an obstacle to achieving the federal objective of preventing fraud in the 340B Program").

The claims-data restriction conflicts with other federal laws, too. For example, under the

Inflation Reduction Act, Congress instructed HHS to "negotiate" with manufacturers the

"maximum fair price[s]" for certain drugs that HHS selects. 42 U.S.C. § 1320f-3(a). Manufacturers

must provide selected drugs at the lower of the "maximum fair price" or the 340B price. *Id.*

§ 1320f-2(d). The Centers for Medicare and Medicaid Services (CMS) leaves it to manufacturers

to prevent duplicate price reductions by identifying when a drug is dispensed as a 340B drug. *See*

CMS, Medicare Drug Price Negotiation Program: Final Guidance, at 58-60 (Oct. 2, 2024),

http://bit.ly/3Y719J0. But SB 71 bars manufacturers from obtaining the data they need to conduct

this federally required de-duplication. The statute therefore deprives manufacturers of their rights

under federal law. *See* 42 U.S.C. § 1320f-2(d).

SB 71's claims-data restriction obstructs federal law in other ways. HRSA recently

proposed a pilot program under which manufacturers may first receive sales data from covered

entities before paying 340B rebates. 90 Fed. Reg. 38,165 (Aug. 7, 2025). Obtaining such data

helps manufacturers "address 340B and Maximum Fair Price (MFP) deduplication" under the IRA,

and it also "facilitate[s] . . . the prevention of 340B Medicaid duplicate discounts and diversion." *Id.* at 38,165. The data identified as appropriate for a manufacturer to receive under the pilot program is the same data that SB 154's data-collection restriction forbids them to request. *See id.* at 38,167. SB 71 thus precludes manufacturers like AstraZeneca from participating in the pilot program, because it forbids them from collecting the data that the pilot program contemplates.

**4.** Some courts have held that the 340B statute does not preempt state laws similar to SB 71. *See PhRMA v. McClain*, 95 F.4th 1136 (8th Cir. 2024). But those courts have assumed, without analysis or an evidentiary record, that the state laws regulated "delivery" rather than pricing, *id.* at 1145—ignoring the laws' actual "operation and effect," *Wos*, 568 U.S. at 63. Here, the failure to offer a 340B-discounted price for unlimited contract pharmacy sales is what SB 71 forbids.

But even if SB 71 could somehow be described as regulating the delivery of 340B-discounted drugs—contrary to how it actually operates—the statute *still* would be preempted. However described, SB 71 "function[s] as a command to [manufacturers] to structure their operations" so that 340B-discounted prices are available for unlimited contract pharmacy sales. *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 464 (2012). AstraZeneca is thus forced to make costly discounts available beyond what federal law requires. Indeed, the Legislature was candid about that goal, expressly finding that contract pharmacy policies like AstraZeneca result in decreased revenue ("financial resources") for covered entities, and it enacted SB 71 to restore that revenue ("additional resources"). SB 71 § 6-29-102(1)(c), (2). This money does not just appear; it comes from manufacturers like AstraZeneca. Even if the money is extracted by means of an ostensible obligation to "deliver" discounted drugs, that costly state-law obligation still skew[s]" the "delicate balance of statutory objectives" that underlies the 340B program. *Buckman*, 531 U.S. at 348, 353.

The courts that have rejected 340B preemption claims, moreover, did not have the benefit

of a factual record that addressed the actual operation of the 340B program under the predominant replenishment model. Their decisions accordingly were based on incorrect factual premises that "[c]overed entities purchase and maintain title to the 340B-discounted drugs," *PhRMA*, 95 F.4th at 1144, and that each contract pharmacy "becomes an agent of the covered entity," *id.* at 1142. Those premises are wrong. Am. Compl. ¶ 46. Also, nothing "indicates that the replenishment model" used by most covered entities "was considered by those . . . courts." *Morrisey*, 760 F. Supp. 3d at 456. Here, AstraZeneca intends to seek expedited discovery to address issues like title and agency under the replenishment model, and to develop a factual record bearing on preemption.

## B.     SB 71 Is Preempted by Federal Patent Law

Under the federal patent law, inventors are "impelled to invest in creative effort" on the promise that they will obtain "a federally protected 'exclusive right'" to sell their inventions for a limited period. *BIO*, 496 F.3d at 1373. The public benefits from access to new inventions during the exclusivity period; and after the period expires, the public gets "lower price[s] through unfettered competition." *Id.* States may not affect that tradeoff: "Where it is clear how the patent laws strike that balance in a particular circumstance, that is not a judgment the States may second-guess." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 152 (1989).

State laws that cap or fix the price at which patented drugs may be sold are thus preempted by federal patent law because they "re-balance the statutory framework of rewards and incentives . . . in effect diminishing the reward to patentees in order to provide greater benefit to . . . drug consumers." *BIO*, 496 F.3d at 1374. As the Federal Circuit has explained, "[t]he underlying determination about the proper balance between innovators' profit and consumer access to medication . . . is exclusively one for Congress to make," and laws capping the price of patented products are "contrary to the goals established by Congress in the patent laws." *Id.* at 1374.

SB 71 facially regulates drug pricing. It requires AstraZeneca to offer its patented drugs at 340B-discounted prices, rather than market prices, for unlimited contract pharmacy sales. Whereas Section 340B caps prices with respect to a limited set of sales involving covered entities, SB 71 purports to extend those price caps to an additional category of sales—unlimited contract pharmacy sales—that federal courts have held are *not* required by federal law. Pricing is the only thing that distinguishes a sale that complies with SB 71 from a sale that violates the law. The statute thus functions as a price cap for contract pharmacy sales—one that impermissibly constrains manufacturers' "opportunity" to take advantage of the benefit of exclusivity conferred by Congress "during the patent's term." *Id.* at 1372. It is therefore preempted.

Finally, as above, SB 71 would be preempted even if (contrary to fact) it regulates drug distribution, rather than pricing. Either way, the law compels a manufacturer to provide covered entities and their contract pharmacy partners with additional "financial resources" via discounts on its patented products. SB 71 § 6-29-102(2). That costly obligation "in effect diminish[es] the reward to patentees" like AstraZeneca "to provide greater benefit[s] to" in-state covered entities. *BIO*, 496 F.3d 1374. However "worthy" Colorado deems that objective to be, "it is contrary to the goals established by Congress in the patent laws," which are intended to give a drug manufacturer "the full exercise of the exclusionary power that derives from a patent." *Id.* As applied to AstraZeneca's patented products, therefore, SB 71 is "preempted by federal patent law." *Id.*

## II.  ASTRAZENECA WILL SUFFER IRREPARABLE HARM ABSENT RELIEF

SB 71 threatens to inflict two kinds of irreparable harm on AstraZeneca: unrecoverable financial losses and unconstitutional state enforcement actions.

**A.** SB 71 compels AstraZeneca to provide discounts that cannot later be recouped if the Act is invalidated. While Section 340B requires AstraZeneca to offer its products at discounted

prices in limited circumstances, the Act substantially expands the category of sales to which 340B

pricing obligations apply. As a result, AstraZeneca estimates losses in Colorado of approximately

$600,000 per month if forced to comply. Mancill Decl. ¶ 28. Importantly, once a sale has been

made at 340B-discounted prices, there is "no mechanism" under state or federal law for recovering

the amount of the discount later if SB 71 is declared unconstitutional. *Id.* ¶ 29. An economic injury

is irreparable "if the funds cannot be recouped and are thus irrevocably expended." *NIH v. Am.*

*Public Health Ass'n*, 145 S. Ct. 2658, 2659 (2025) (cleaned up); *see Chamber of Comm. v.*

*Edmondson*, 594 F.3d 742, 770-71 (10th Cir. 2010) ("Imposition of monetary damages that cannot

later be recovered for reasons such as sovereign immunity constitutes irreparable injury.").

Similarly, SB 71's claims-data restriction leaves AstraZeneca with no way to obtain data

about transactions that have already occurred. Absent this data, AstraZeneca cannot acquire the

documentation it needs to pursue an audit, a prerequisite for initiating an ADR proceeding. Mancill

Decl. ¶ 30. The claims-data restriction also limits AstraZeneca's ability to identify when its drugs

that have been selected for the Medicare Drug Price Negotiation Program (Farxiga and Calquence)

have been dispensed as 340B drugs, preventing AstraZeneca from avoiding duplicative price

reductions, which compounds its unrecoverable financial losses. *Id.* ¶ 31.

**B.** Courts recognize that "[w]hen an alleged constitutional right is involved, . . . no further

showing of irreparable injury is necessary." *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012)

(citation omitted). Instead, "[m]ost courts consider the infringement of a constitutional right

enough and require no further showing of irreparable injury." *Free the Nipple-Fort Collins v. City*

*of Fort Collins*, 916 F.3d 792, 805 (10th Cir. 2019); *see id.* at 806 ("[W]ell-settled law supports

the constitutional-violation-as-irreparable-injury principle.") That is because "[w]hat makes an

injury 'irreparable' is the inadequacy of, and the difficulty of calculating, a monetary remedy after

a full trial," and "[a]ny deprivation of any constitutional right fits that bill." *Id.* at 806. Because SB 71 violates the Supremacy Clause, AstraZeneca will be irreparably harmed if forced to comply.

## III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR RELIEF

The balance of equities and public interest merge when the government is the opposing party. *Rocky Mntn. Gun Owners v. Polis*, 121 F.4th 96, 112 (10th Cir. 2024). When a party argues that federal law preempts state regulation, therefore, "the court may issue an injunction upon finding the state regulatory actions preempted." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015); *accord Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 906 n.19 (10th Cir. 2017). Both factors would be "served by an injunction" here, because the State "does not have an interest in enforcing a law that is likely constitutionally infirm." *Edmondson*, 594 F.3d at 771. To the contrary, "the public interest will perforce be served by enjoining the enforcement of the invalid provisions of state law." *Id.* (citation omitted); *see Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1076 (10th Cir. 2001) (similar). "[I]t is always in the public interest to prevent the violation of a party's constitutional rights," moreover, including AstraZeneca's right not to be subjected to unconstitutional state-law obligations and unrecoverable economic losses. *Awad*, 670 F.3d at 1132 (citation omitted). Colorado has no legitimate interest in enforcing an unconstitutional law, such that an injunction preventing enforcement of SB 71 would not irreparably harm the State.

## CONCLUSION

The Court should grant AstraZeneca's motion for a preliminary injunction.

DATED this 1st day of October 2025.              */s/ Allon Kedem*
                                                   Allon Kedem
                                                   Jeffrey L. Handwerker
                                                   Colin M. O'Brien
                                                   ARNOLD & PORTER KAYE SCHOLER LLP

                                                   *Attorneys for AstraZeneca Pharmaceuticals LP*

**CERTIFICATE OF SERVICE**

I, Allon Kedem, hereby certify that on this 1st day of October 2025, the foregoing Motion for a Preliminary Injunction and accompanying Declaration were filed using the District of Colorado CM/ECF filing system. Additionally, I hereby certify that hard copies of the Motion and accompanying Declaration will be served on all Defendants, along with a copy of the Amended Complaint, as soon as the Clerk of Court issues the summonses requested at ECF No. 22.

DATED this 1st day of October 2025.        */s/ Allon Kedem*
                                           Allon Kedem
                                           ARNOLD & PORTER KAYE SCHOLER LLP

                                           *Attorney for AstraZeneca Pharmaceuticals LP*