IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 25-cv-02685-PAB-STV

ASTRAZENECA PHARMACEUTICALS LP,

Plaintiff,

v.

PHILIP J. WEISER, in his official capacity as the Attorney General of the State of Colorado, et al.,

Defendants.

---

**ORDER**

---

This matter comes before the Court on Defendants' Motion to Dismiss [Docket No. 61]. Plaintiff filed a response, Docket No. 69, and defendants filed a reply. Docket No. 75. The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## I. BACKGROUND[1]

In 1992, Congress created the so-called Section 340B program by enacting § 340B of the Public Health Service Act, 42 U.S.C. § 256b ("Section 340B"). *Astra USA, Inc. v. Santa Clara Cnty., Cal.*, 563 U.S. 110, 113 (2011). Section 340B "imposes ceilings on prices drug manufacturers may charge for medications sold to specified health-care facilities." *Id.* The Section 340B program was created "to ensure that uninsured and low-income individuals can access the medications they need and to

[1] Defendants' motion to dismiss is premised primarily on legal issues, not factual issues. Therefore, the background section of this order mostly describes the legal and statutory background of this case. To the extent it discusses factual background, those facts are taken from plaintiff's amended complaint, Docket No. 22, and are presumed to be true, unless otherwise noted, for purposes of ruling on defendants' motion to dismiss.

ensure that medical providers serving these individuals receive crucial subsidies." *AbbVie, Inc. v. Fitch*, 152 F.4th 635 (5th Cir. 2025). The specified health-care facilities are known as "covered entities" and "include public hospitals and community health centers" which often provide "safety-net services to the poor." *Astra*, 563 U.S. at 113.

The Section 340B program "is superintended by the Health Resources and Services Administration (HRSA), a unit of the Department of Health and Human Services (HHS). Drug manufacturers opt into the 340B Program by signing a form Pharmaceutical Pricing Agreement (PPA) used nationwide." *Id.* PPAs are "uniform agreements that recite the responsibilities § 340B imposes." *Id.* One of these responsibilities requires that manufacturers "offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price." 42 U.S.C. § 256b(a)(1). Drug manufacturers cannot participate in Medicaid and Medicare Part B unless they participate in the Section 340B program. *Astra*, 563 U.S. at 113.

Section 340B also places certain restrictions on covered entities. *See* 42 U.S.C. § 256b(a)(5)(A)-(D); *see also Fitch*, 152 F.4th at 640 (listing the restrictions that Section 340B places on covered entities). Covered entities are forbidden to seek "duplicate discounts or rebates," meaning they cannot seek a Section 340B discount and a Medicaid rebate on the same drug. 42 U.S.C. § 256b(a)(5)(A). Covered entities are also forbidden from reselling or transferring a covered drug to a person who is not a patient of the covered entity. 42 U.S.C. § 256b(a)(5)(B). To ensure compliance with these restrictions, covered entities must permit the Secretary of Health and Human Services and the manufacturer of covered drugs to audit their records. 42 U.S.C.

§ 256b(a)(5)(C). If a covered entity fails to comply with these restrictions, it will be liable to the drug manufacturer for the amount improperly received. 42 U.S.C. § 256b(a)(5)(D).

Since Section 340B was first enacted, "covered entities have contracted with outside pharmacies, referred to as 'contract pharmacies,' for the distribution and dispensation of 340B drugs. This is in large part due to the fact that building or maintaining a pharmacy is cost-prohibitive for many covered entities. Additionally, the outsourcing of pharmacy services has allowed for drug dispensation closer to where low-income patients reside." *Pharm. Rsch. & Manufacturers of Am. v. McClain*, 95 F.4th 1136, 1139 (8th Cir. 2024).

In 1996, HRSA issued guidance stating its belief that Section 340B is silent regarding how covered drugs were to be distributed, and that silence created a gap in the legislation. *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 456-57 (D.C. Cir. 2024) (citing Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 Fed. Reg. 43,549, 43,549-50 (Aug. 23, 1996) ("1996 Guidance")). Seeking to fill that gap, "HRSA stated that a covered entity without an in-house pharmacy may contract with a single outside pharmacy to dispense drugs at a single location." *Id.* at 457 (citing 1996 Guidance at 43,555). In 2010, HRSA issued new guidance stating that "covered entities may contract with an unlimited number of outside pharmacies and may do so regardless of whether the entities have in-house pharmacies." *Id.* (citing Notice Regarding 340B Drug Pricing Program—Contract Pharmacy Services, 75 Fed. Reg. 10,272, 10,272–73 (Mar. 5, 2010) ("2010 Guidance")). HRSA recognized that "contract pharmacies enable covered entities to

'create wider patient access by having more inclusive arrangements in their communities.'" *Id.* (quoting 2010 Guidance at 10,273). "After the 2010 guidance, the use of contract pharmacies skyrocketed." *Sanofi Aventis U.S. LLC v. United States Dep't of Health & Hum. Servs.*, 58 F.4th 696, 700 (3d Cir. 2023).

Drug manufacturers believed that the proliferative use of contract pharmacies was increasing duplicate discounting and diversion. *Id.* Specifically, manufacturers worried that the "replenishment model" used by many contract pharmacies to stock Section 340B discounted drugs led to increased abuse of the Section 340B program. *Johnson*, 102 F.4th at 457-58. The D.C. Circuit explained how the replenishment model operates and how it can potentially be abused by contract pharmacies:

> While some contract pharmacies maintain separate inventories of section 340B drugs, most fill prescriptions from inventories that intermingle discounted and non-discounted drugs. Only after dispensing the drugs do these pharmacies attempt to discern whether individual customers were patients of covered entities—in other words, whether individual prescriptions were eligible for the discount. Many pharmacies outsource this determination to third-party administrators, who often receive a larger fee for every prescription deemed eligible for the discount. Once the pharmacy or the administrator categorizes a certain number of prescriptions as eligible, the pharmacy places an order to replenish its section 340B purchases. The covered entity, the pharmacy, and the third-party administrator often divvy up the spread between the discounted price and the higher insurance reimbursement rate. Each of these actors thus has a financial incentive to catalog as many prescriptions as possible as eligible for the discount.

*Id.*

In 2020, attempting to combat this alleged abuse, manufacturers adopted policies limiting the use of contract pharmacies. *Id.* at 458. AstraZeneca Pharmaceuticals LP ("AstraZeneca") was one of the manufacturers who adopted such a policy, allowing 340B discounts at only a single designated contract pharmacy, and only

for covered entities that lack an in-house pharmacy. Docket No. 22 at 20, ¶¶ 55-56. In response to these new policies by drug manufacturers, "HHS issued an advisory opinion stating that section 340B requires manufacturers to deliver covered drugs to any contract pharmacies with which a covered entity chooses to partner." *Johnson*, 102 F.4th at 458. Drug manufacturers challenged HHS's interpretations in court. The Third Circuit and the D.C. Circuit held that Section 340B is silent about delivery, and therefore it does not require manufacturers to distribute discounted drugs to contract pharmacies. *Id.* at 464; *Sanofi Aventis*, 58 F.4th at 707. "HHS ultimately withdrew the advisory opinion." *Fitch*, 152 F.4th at 641.

"Soon after, several states passed laws to protect covered entities' partnerships with contract pharmacies, attempting to do by statute what HHS had done in its advisory opinion." *Id.* Nationwide, drug manufacturers have challenged these state statutes as unconstitutional; to date, courts have largely rejected those challenges.[2]

[2] *See AbbVie, Inc. v. Murrill*, 180 F.4th 747 (5th Cir. 2026) (affirming order granting summary judgment to the state); *Fitch*, 152 F.4th at 648 (affirming order denying preliminary injunction); *McClain*, 95 F.4th at 1146 (affirming order granting summary judgment to state); *Abbvie, Inc. v. Weiser*, No. 25-cv-01847-WJM-KAS, 2026 WL 1678085 (D. Colo. June 10, 2026) (order granting motion to dismiss); *Pharm. Rsch. & Manufacturers of Am. v. Weiser*, No. 25-cv-02437-RMR-STV, 2026 WL 763970 (D. Colo. Mar. 18, 2026) (denying preliminary injunction); *Abbvie, Inc. v. Weiser*, 811 F. Supp. 3d 1264 (D. Colo. 2025) (same); *AstraZeneca Pharms. LP v. Lopez*, 2026 WL 497141 (D. Haw. Feb. 23, 2026) (same); *Novartis Pharms. Corp. v. Frey*, 2025 WL 2813787 (D. Me. Sept. 23, 2025) (same); *AbbVie Inc. v. Skrmetti*, 2025 WL 1805271 (M.D. Tenn. June 30, 2025) (same); *AstraZeneca Pharms. LP v. Bailey*, 2025 WL 644285 (W.D. Mo. Feb. 27, 2025) (granting in part and denying in part state's motion to dismiss, with denial limited to contract clause argument); *Novartis Pharms. Corp. v. Bailey*, 2025 WL 595189 (W.D. Mo. Feb. 24, 2025) (denying preliminary injunction); *Pharm. Rsch. & Manufacturers of Am v. Murrill*, 2024 WL 4361597 (W.D. La. Sept. 30, 2024) (granting summary judgment to state); *AstraZeneca Pharms. LP v. Fitch*, 766 F. Supp. 3d 657 (S.D. Miss. 2024) (denying preliminary injunction); *AbbVie Inc. v. Fitch*, 2024 WL 3503965 (S.D. Miss. July 22, 2024) (same), *aff'd*; *Novartis Pharms. Corp. v. Fitch*, 738 F. Supp. 3d 737 (S.D. Miss. 2024) (same); *Pharm. Rsch. & Manufacturers of*

Like many other states, Colorado passed a statute, Senate Bill 25-071, which requires drug manufacturers to deliver drugs discounted under Section 340B to unlimited contract pharmacies. *Abbvie, Inc.*, 811 F. Supp. 3d at 1271-72. Senate Bill 25-071 is now codified as the Colorado 340B Contract Pharmacy Protection Act, Colorado Revised Statutes §§ 6-29-101 *et seq.* (2025) ("S.B. 71"). *Id.* at 1269. S.B. 71 took effect on August 6, 2025. *Id.* n.1. The statute prohibits manufacturers from doing the following:

> (a) Unless the receipt of the 340B drugs is prohibited by the federal department of health and human services, a manufacturer, third-party logistics provider, or repackager, or an agent, contractor, or affiliate of a manufacturer, third-party logistics provider, or repackager, including an entity that collects or processes health information, shall not, directly or indirectly, deny, restrict, prohibit, discriminate against, or otherwise limit the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B covered entity, a pharmacy contracted with a 340B covered entity, or a location otherwise authorized by a 340B covered entity to receive and dispense 340B drugs.
>
> (b) A manufacturer shall not directly or indirectly require, including as a condition, a 340B covered entity, a pharmacy contracted with a 340B covered entity, or any other location authorized to receive 340B drugs by a 340B covered entity to submit any health information, claims or utilization data, purchasing data, payment data, or other data that does not relate to a claim submitted to a federal health care program, unless such data is voluntarily furnished by such covered entity or otherwise required to be furnished under applicable federal law.

Colo. Rev. Stat. § 6-29-105. The requirement to provide access to Section 340B discounted drugs for unlimited contract pharmacy sales will cause

---

*Am v. Fitch*, 2024 WL 3277365 (S.D. Miss. July 1, 2024) (same); *but see Pharm. Rsch. & Manufacturers of Am v. Morrisey*, 760 F. Supp. 3d 439 (S.D. W. Va. 2024) (granting preliminary injunction); *AbbVie Inc. v. Drummond*, 2025 WL 3048929 (W.D. Okla. Oct. 31, 2025) (granting preliminary injunction in part).

AstraZeneca to lose approximately $600,000 per month. Docket No. 22 at 32, ¶ 98.

On August 27, 2025, plaintiff AstraZeneca filed this lawsuit against defendants Philip J. Weiser, in his official capacity as the Attorney General of the State of Colorado, and Kristen Wolf, Ryan Leyland, Patricia Evacko, Avani Soni, Michael Scruggs, Alexandra Zuccarelli, and Jayant Patel, in their official capacities as Members of the Colorado State Board of Pharmacy, ("defendants") to challenge the constitutionality of S.B. 71. Docket No. 1. AstraZeneca brings claims that S.B. 71 is unconstitutional because it (1) is preempted by Section 340B; (2) is preempted by federal patent laws; (3) violates the Contracts Clause, U.S. Const. art. I § 10, cl. 1; and (4) violates the Takings Clause, U.S. Const., amend. V. Docket No. 1 at 35-39, ¶¶ 112-131. On October 1, 2025, AstraZeneca filed a motion for a preliminary injunction seeking to enjoin S.B. 71 from being enforced against it, Docket No. 25, which the Court denied on December 17, 2025.[3] Docket No. 72.

Two other pharmaceutical companies have challenged the constitutionality of S.B. 71 in this district. *See Abbvie, Inc.*, 2026 WL 1678085, at *1; *Pharm. Rsch. & Manufacturers of Am.*, 2026 WL 763970, at *1. The first of those cases was dismissed, *Abbvie, Inc.*, 2026 WL 1678085, at *8, and, in the second case, the court denied the plaintiff's motion for preliminary injunction. *Pharm. Rsch. & Manufacturers of Am.*, 2026 WL 763970, at *8.

---

[3] The motion for a preliminary injunction only discussed AstraZeneca's preemption claims, and therefore the Court did not consider AstraZeneca's other claims in its December 17, 2025 order. Docket No. 72 at 7 n.2.

In this case, defendants filed a motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), arguing that AstraZeneca does not have standing to bring this action and, even if it does, AstraZeneca's claims fail on the merits. Docket No. 61. AstraZeneca filed a response, Docket No. 69, and defendants filed a reply. Docket No. 75.

## II. LEGAL STANDARD

### A. <u>12(b)(1)</u>

Federal Rule of Civil Procedure 12(b)(1) allows a party to move to dismiss a claim for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). A dismissal under Rule 12(b)(1) is not a judgment on the merits; rather, it is a determination that the court lacks jurisdiction to adjudicate the claim. *Creek Red Nation, LLC v. Jeffco Midget Football Ass'n., Inc.*, 175 F. Supp. 3d 1290, 1293 (D. Colo. 2016). A court lacking jurisdiction "must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, 945 F.3d 1270, 1273 (10th Cir. 2019) (citation omitted). The dismissal is without prejudice. *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1218 (10th Cir. 2006).

Challenges to subject matter jurisdiction may take two forms – a facial attack or a factual attack – each with distinct analytical frameworks. *United States v. Rodriguez-Aguirre*, 264 F.3d 1195, 1203 (10th Cir. 2001). A facial challenge focuses on the sufficiency of the allegations in the complaint. *Id.* In resolving a facial challenge, "the district court must accept the allegations in the complaint as true." *Id.* By contrast, a factual challenge allows a party to "go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends." *Id.* (citation

omitted). In addressing a factual challenge to subject matter jurisdiction, "the court does not presume the truthfulness of the complaint's factual allegations." *Id.* (citation and quotations omitted); *see also Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001) ("a court's reference to evidence outside the pleadings does not convert the motion into a Rule 56 motion"). "A challenge to a plaintiff's standing to bring a particular claim is properly raised in a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction." *Creek Red Nation, LLC*, 175 F. Supp. 3d at 1293.

**B. <u>12(b)(6)</u>**

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The 'plausibility' standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible." *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1168 (D. Colo. 2018) (citing *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008)). Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555) (alterations omitted). A court, however, does not need to accept conclusory allegations. *See, e.g.*, *Hackford v. Babbit*, 14 F.3d 1457, 1465 (10th Cir. 1994) ("we are not bound by conclusory allegations, unwarranted inferences, or legal conclusions").

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that

the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quotations and alterations omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)). If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim. *Khalik*, 671 F.3d at 1191 (quotations omitted). Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Bryson*, 534 F.3d at 1286 (alterations omitted).

## III. ANALYSIS

The Court will first analyze defendants' standing argument because, if AstraZeneca lacks standing to bring this action, the Court is unable to analyze the merits of the claims. *See Baker v. State*, No. 13-cv-01334-PAB-KLM, 2014 WL 624342, at *2 (D. Colo. Feb. 18, 2014) ("Absent standing, the Court lacks subject matter jurisdiction to consider the substance of plaintiff's claim.") (citation omitted).

### A. <u>Standing</u>

At its core, "standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To establish standing, "a plaintiff must show: (1) that he has 'suffered an injury in fact'; (2) that the injury is 'fairly traceable to the challenged action of the defendant'; and (3) that it is 'likely' that 'the injury will be redressed by a favorable decision.'" *Am. Humanist Ass'n, Inc. v. Douglas Cty. Sch. Dist.*

*RE-1*, 859 F.3d 1243, 1250 (10th Cir. 2017) (quoting *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 133-34 (2011)). The party asserting federal jurisdiction has the burden of supporting each of these elements in "the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. Thus, "[a]t the pleading stage, general factual allegations of injury . . . may suffice." *Id.*

Defendants argue that AstraZeneca does not have standing because its alleged injuries are not fairly traceable to S.B. 71. Docket No. 61 at 5. Rather, defendants state that AstraZeneca's injuries are traceable to its voluntary participation in Section 340B. *Id.* at 5-6. However, AstraZeneca alleges that S.B. 71 makes participation in Section 340B more costly through its requirement to make Section 340B discounted drugs available at unlimited contract pharmacies. Docket No. 22 at 32, ¶ 98. AstraZeneca projects this will result in it losing approximately $600,000 per month. *Id.* While AstraZeneca's estimated losses may ultimately stem from AstraZeneca's participation in Section 340B, the Court finds that AstraZeneca is incentivized to participate in Section 340B because otherwise it cannot participate in Medicaid and Medicare Part B. Thus, making participation in Section 340B more costly is a "concrete and particularized" injury that is fairly traceable to S.B. 71. *See Lujan*, 504 U.S. at 560 (stating that an injury in fact must be "concrete and particularized.") (citations omitted).

Defendants also argue that any injury due to diversion or duplicate discounts is traceable to illegal transfers of Section 340B drugs, and not to S.B. 71. Docket No. 61 at 6. However, AstraZeneca alleges that illegal transfers of Section 340B drugs are

more common in contract pharmacies, and are thus made more common by S.B. 71. Docket No. 22 at 17-18, ¶¶ 47-49. Accordingly, the Court concludes that AstraZeneca has established that its injury is fairly traceable to S.B. 71. AstraZeneca therefore has standing to bring this action.

### B. Preemption

Article VI, cl. 2 of the Constitution—known as the Supremacy Clause—provides that "the Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. "Under this principle, Congress has the power to preempt state law." *Arizona v. United States*, 567 U.S. 387, 399 (2012). If a federal law regulates something "inherently federal in character," no presumption against preemption applies. *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001). However, if a state law regulates in an area within the historic police power of the States, courts must assume that it is not preempted "unless that was the clear and manifest purpose of Congress." *Arizona*, 567 U.S. at 400 (citation omitted). "This makes congressional intent 'the ultimate touchstone in every pre-emption case.'" *Bradshaw v. Am. Airlines, Inc.*, 123 F.4th 1168, 1173 (10th Cir. 2024) (citing *Wyeth v. Levine*, 55 U.S. 555, 565 (2009)). Congress can demonstrate its intent to preempt expressly, through enacting a statute containing a preemption provision. *Arizona*, 567 U.S. at 399. Preemption can also by implied through a statute's "structure and purpose." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). Section 340B does not contain a preemption provision, so any preemption would have to be implied.

There are two types of implied preemption: field preemption and conflict preemption. *Fitch*, 152 F.4th at 645. Field preemption "exists where 'a framework of

regulation' of a field is 'so pervasive' that it leaves no space for state supplementation or where the federal interest is 'so dominant' that the existence of a federal scheme can 'be assumed to preclude enforcement of state laws on the same subject.'" *Bradshaw*, 123 F.4th at 1173 (citing *Arizona*, 567 U.S. at 399). "Conflict preemption occurs either when compliance with both the federal and state laws is a physical impossibility, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Keith v. Rizzuto*, 212 F.3d 1190, 1193 (10th Cir. 2000) (internal quotation and citation omitted).

### *1. Presumption Against Preemption*

As an initial matter, AstraZeneca argues that the presumption against preemption does not apply in this case because S.B. 71 regulates something inherently federal in character. Docket No. 69 at 8-9 (citing *Buckman*, 531 U.S. at 347). Specifically, AstraZeneca cites *Buckman* to argue that, because S.B. 71 directly targets and depends on federal law, namely, Section 340B, it regulates a uniquely federal interest beyond the States' traditional police power. *Id.* However, *Buckman* "[does] not support the broad contention that there is necessarily a . . . preemption issue where a state law explicitly depends on a federal statute."[4] *Abbvie, Inc.*, 811 F. Supp. 3d at 1275 (internal quotation omitted).

---

[4] AstraZeneca cites *Boyle v. United Techs. Corp.*, 487 U.S. 500, 505 (1988), for the proposition that state laws which target Spending Clause programs are not subject to the presumption against preemption because Spending Clause programs implicate federal interests. Docket No. 69 at 4. However, *Boyle*, 487 U.S. at 505-06, analyzes whether civil liabilities arising out of the performance of federal procurement contracts constitute a uniquely federal interest, not whether Spending Clause programs implicate a uniquely federal interest. And Justice Barrett stated in 2024 that the Supreme Court has never decided whether a statute enacted under Congress's spending power that operates on private parties, like Section 340B, is able to preempt state law at all. *Moyle v. United States*, 603 U.S. 324, 334 (2024) (Barrett, J, concurring). Thus, the Court's

In *Buckman*, the state law at issue attempted to prevent fraud against federal agencies. *Buckman*, 531 U.S. at 347. The *Buckman* court determined that this was not "a field which the States have traditionally occupied." *Id.* (citation omitted). Conversely, courts have repeatedly found that laws like S.B. 71 implicate matters traditionally within a state's police powers, such as public health and the practice of pharmacy. *Abbvie, Inc.*, 2026 WL 1678085, at *4 (collecting cases). The Supreme Court has noted that there is a "presumption that state or local regulation of matters related to health and safety is not invalidated under the Supremacy Clause." *Hillsborough Cnty., Fla. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 715 (1985); *see also Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996) ("Throughout our history the several States have exercised their police powers to protect the health and safety of their citizens. Because these are primarily, and historically, . . . matter[s] of local concern, . . . the States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons.") (citations and internal quotations omitted). Thus, unlike the state law in *Buckman*, the state law here does not implicate a uniquely federal interest. Accordingly, the presumption against preemption applies. *See Abbvie, Inc.*, 2026 WL 1678085, at *4; *Fitch*, 152 F.4th at 648.

#### ***2. Preemption by Section 340B***

Defendants assert that S.B. 71 is not preempted by Section 340B. Docket No. 61 at 8-15. AstraZeneca, on the other hand, argues that Section 340B preempts S.B. 71 because: (1) both laws regulate price; (2) S.B. 71 makes participation in Section 340B more expensive; (3) S.B. 71 interferes with Section 340B's enforcement regime;

---

analysis is unaffected by the fact that Section 340B was implemented through Congress's Spending Clause powers.

and (4) S.B. 71's claims-data restriction conflicts with federal laws and regulations. Docket No. 69 at 9-15. The Court will analyze each argument in turn.

**a. Whether S.B. 71 Regulates Price or Delivery**

AstraZeneca argues that S.B. 71 regulates drug pricing, not delivery. *Id.* at 9-12. As the Court explained in its December 17, 2025 order, it is not clear why this matters to the preemption analysis. Docket No. 72 at 14-15. AstraZeneca appears to be taking the stance that, if S.B. 71 and Section 340B both regulate price, they necessarily conflict such that S.B. 71 is preempted. However, AstraZeneca fails to explain what conflict would ensue if S.B. 71 and Section 340B both regulate price. *See* Docket No. 69 at 9-12. The Court does not find that any such conflict exists. Section 340B sets discounted drug prices for eligible patients. S.B. 71 mandates that those Section 340B-discounted drugs must be distributed to unlimited contract pharmacies. The Court fails to see how those two requirements conflict with one another; if anything, they seem to complement each other. The federal government, acting through HHS, attempted to enact the same requirement as S.B. 71 through its 2020 guidance. *Johnson*, 102 F.4th at 459. The Third Circuit and D.C. Circuit, however, held that Section 340B is silent about delivery and therefore does not contain such a requirement. *Id.* at 464; *Sanofi Aventis*, 58 F.4th at 707. Colorado and other states attempted to fill the gap through state legislation that mirrors the earlier guidance of HHS. The Court finds that such legislation does not create a conflict, regardless of whether S.B. 71 is considered to regulate price or to regulate delivery.

In any event, the Court finds that S.B. 71 does not regulate price. Other courts agree. *See Abbvie, Inc.*, 811 F. Supp. 3d at 1280 ("the Court . . . concludes that AbbVie has not demonstrated a substantial likelihood of success on the merits of its preemption

claim based on its assertion that, like Section 340B, [S.B. 71] purports to regulate pricing."); *Fitch*, 152 F.4th at 647 (stating that a law substantially similar to S.B. 71 regulates the distribution of drugs, not the pricing of those drugs); *McClain*, 95 F.4th at 1145 (same); *Murrill*, 180 F.4th at 761 (same).

AstraZeneca's arguments to the contrary are unpersuasive. AstraZeneca notes that S.B. 71 identifies the drugs it regulates in terms of their price. Docket No. 69 at 10. For example, S.B. 71 states that manufacturers "shall not . . . prohibit . . . the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B covered entity, a pharmacy contracted with a 340B covered entity, or a location otherwise authorized by a 340B covered entity to receive and dispense 340B drugs." Colo. Rev. Stat. § 6-29-105(1)(a). A 340B drug is defined as any drug discounted under the Section 340B program that has been purchased by a covered entity. Colo. Rev. Stat. § 6-29-103(2). In AstraZeneca's view, the fact that these drugs are identified by their price is enough to make S.B. 71 a regulation of price. Docket No. 69 at 10. But S.B. 71 is clear that it is Section 340B that sets the price of the discounted drugs; S.B. 71 merely dictates that those drugs must be made available at more locations, namely, at unlimited contract pharmacies.

AstraZeneca further argues that the "replenishment model" is indicative that S.B. 71 regulates price. Docket No. 69 at 12. Under the replenishment model, discounted and non-discounted drugs are intermingled on the shelves of the pharmacy, and it is not determined by the pharmacy which drugs are discounted under Section 340B until they are already dispensed. *Johnson*, 102 F.4th at 457-58. As a result, AstraZeneca asserts that, because the drug is

already in the hands of the contract pharmacy before the patient arrives at the pharmacy, the question is not about delivery of the drug. Docket No. 69 at 12 (citing *Morrisey*, 760 F. Supp. 3d at 455). However, "[r]eplenishment inventory systems are commonplace [and] . . . pharmaceuticals distribution often relies on pharmaceuticals' fungibility to facilitate efficiency." *Fitch*, 2024 WL 3503965, at *14 (citation omitted). Thus, the Court agrees that the replenishment model is a means of efficient distribution, and AstraZeneca's argument reflects a "technicality," which does not suddenly make S.B. 71 a regulation of price. *See id.* at *15 (stating that the replenishment model facilitates efficient distribution of Section 340B drugs and that reality cannot "be undercut by technicality"). Accordingly, the Court finds that S.B. 71 does not regulate price and, even if it did, that would not necessarily mean it is preempted by Section 340B.

**b. Impact on Section 340B Participation**

AstraZeneca argues that S.B. 71 is preempted because it makes participation in Section 340B significantly more costly. Docket No. 69 at 12-13. AstraZeneca does not explain why this causes S.B. 71 to be preempted, besides broadly stating that preemption analysis turns on the law's effect on federal rights. *Id.* at 13. The Court presumes AstraZeneca's argument is that, by increasing the cost of participating in Section 340B, S.B. 71 interferes with the purposes and objectives of Congress in instituting Section 340B and is therefore preempted.[5] AstraZeneca, however, cites no allegations regarding Section 340B's purpose or that Congress was considering the profit of pharmaceutical companies when passing Section 340B.

[5] This was, at least, the argument AstraZeneca made in its motion for a preliminary injunction. *See* Docket No. 72 at 17-18.

Conversely, there is evidence that Section 340B was enacted so healthcare providers could "'reach[ ] more eligible patients and provid[e] more comprehensive services.'" 340B Drug Pricing Program; Administrative Dispute Resolution Regulation, 89 FR 28643-01 ("ADR Rule"), at 28,643 (April 19, 2024) (quoting H.R. Rep. No. 102-384(II), at 12 (1992)); *see also Sanofi Aventis*, 58 F.4th at 699 (stating that Section 340B helps providers care for low-income and rural persons). S.B. 71 helps accomplish this purpose by making Section 340B drugs more accessible to more patients. Thus, as noted by the Eighth Circuit when analyzing a similar Arkansas law, the state statute "does not create an obstacle for pharmaceutical manufacturers to comply with 340B, rather it does the opposite: [the statute] assists in fulfilling the purpose of 340B." *McClain*, 95 F.4th at 1144-45. The Fifth Circuit came to a similar conclusion when analyzing an analogous Louisiana law. *See Murrill*, 180 F.4th at 762 ("Far from frustrating § 340B's objectives, the two laws work in tandem to advance Congress's central aim: ensuring that manufacturers participating in Medicaid offer discounted drugs to covered entities, dominantly, local facilities that provide medical care for the poor.") (internal quotations, citation, and alterations omitted). The Court agrees with the Fifth and Eighth Circuits and finds that AstraZeneca has not plausibly alleged that S.B. 71 interferes with the objectives of Section 340B.

**c. Enforcement Schemes**

AstraZeneca argues that S.B. 71 interferes with Section 340B's administrative and enforcement scheme. Docket No. 69 at 13. In *Astra*, 563 U.S. at 120, the Supreme Court observed that, in certain circumstances, private entities bringing suit under Section 340B would interfere with the administration and enforcement of the program. AstraZeneca argues that any state enforcement of S.B. 71 would cause

similar interference because it would lead to state enforcement of the Section 340B program, interfering with federal administration and enforcement of Section 340B. Docket No. 69 at 13. However, S.B. 71 does not create new enforcement authority over Section 340B; rather, it creates enforcement authority for violations of S.B. 71 itself. *See* Colo. Rev. Stat. § 6-29-105(3)(a) ("The attorney general may investigate a complaint concerning a violation of *this article 29*. A person that violates *this article 29* . . . is subject to the enforcement provisions, civil penalties, and damages set forth in article 1 of this title 6.") (emphasis added). Thus, S.B. 71's enforcement scheme does not impact enforcement of Section 340B, and there is no conflict between the two. *See Abbvie, Inc.*, 811 F. Supp. 3d at 1278 (finding that S.B. 71 only penalizes activity that falls outside the purview of Section 340B). Other courts have come to the same conclusion about state law enforcement schemes like the one found in S.B. 71. *See id.* (collecting cases).

AstraZeneca argues that the federal and state enforcement schemes conflict because S.B. 71 would require state adjudicators to consider and resolve questions of federal law, which might lead to conflicting state and federal interpretations Section 340B. Docket No. 69 at 13-14. However, "state courts are regularly and rightly called on to decide questions of federal law, as they have throughout our history." *In re C & M Props., L.L.C.*, 563 F.3d 1156, 1167 (10th Cir. 2009). Accordingly, the Court finds that AstraZeneca has not plausibly alleged that S.B. 71's enforcement scheme is preempted by Section 340B.

**d. Claims-Data Restriction**

AstraZeneca's final Section 340B preemption argument is that Section 340B preempts S.B. 71's claims-data restriction. Docket No. 69 at 14. Presumably,

AstraZeneca is referring to the restriction set out in Colo. Rev. Stat. § 6-29-105(1)(b), which prohibits manufacturers from requiring covered entities or contract pharmacies to submit any "health information, claims or utilization data, purchasing data, payment data, or other data that does not relate to a claim submitted to a federal health care program, unless such data is voluntarily furnished by such covered entity or otherwise required to be furnished under applicable federal law." Colo. Rev. Stat. § 6-29-105(1)(b).

AstraZeneca argues that this provision interferes with its ability to get the data it needs to audit covered entities and file administrative dispute resolution ("ADR") claims. Docket No. 69 at 15. Before conducting such an audit, manufacturers need documentation from the covered entity or pharmacy that indicates that there is reasonable cause to support a request for an audit. Manufacturer Audit Guidelines and Dispute Resolution Process 0905-ZA-19, 61 FR 65406-01 ("Audit Guidelines"), at 65409 (Dec. 12, 1996). Because S.B. 71 restricts manufacturers' ability to get this documentation, AstraZeneca argues that the claims-data restriction is preempted. Docket No. 69 at 16. Courts addressing this argument, however, have found that manufacturers have not demonstrated that the "reasonable cause" standard is particularly burdensome, or that manufacturers cannot find reasonable cause to perform an audit without requiring claims-data from covered entities or contract pharmacies. *See Skrmetti*, 2025 WL 1805271, at *15-16; *Frey*, 2025 WL 2813787, at *12. As one court observed, "if a manufacturer has an articulable basis for suspecting that a covered entity is engaging in prohibited conduct, it likely will have reasonable cause to request an audit." *Skrmetti*, 2025 WL 1805271, at *16. AstraZeneca indicates that it will be

unable to establish reasonable cause to conduct an audit due to the claims-data provision, but cites to no allegations in the complaint for support. Docket No. 69 at 15. In light of the fact that multiple courts have found that the "reasonable cause" standard is not burdensome, the Court finds that the claims-data restriction would not prevent AstraZeneca from conducting audits. Therefore, the Court finds that AstraZeneca has not plausibly alleged that Section 340B preempts S.B. 71's claims-data restriction.

### *3. Preemption by Federal Patent Laws*

Defendants argue that S.B. 71 is not preempted by federal patent laws, noting that S.B. 71 does not target patent rights. Docket No. 61 at 15. In response, AstraZeneca reiterates that S.B. 71 makes participation in Section 340B more costly, and therefore limits AstraZeneca's opportunity to obtain market-based rewards for its products. Docket No. 69 at 12.

Patent laws "create bargains whereby, '[i]n exchange for bringing new designs and technologies into the public domain through disclosure . . . an inventor receives a limited term of protection from competitive exploitation.'" *Fitch*, 738 F. Supp. 3d at 752 (quoting *Amgen Inc. v. Sanofi*, 598 U.S. 594, 604 (2023)). "In considering preemption of state laws which potentially conflict with federal patent law, courts look to whether a state law 'clashes with the objectives of the federal patent laws.'" *Id.* (citing *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 480 (1974)).

As one court noted about a Hawaii law that is analogous to S.B. 71, "[t]he text of [the law] does not change who may compete with AstraZeneca, when competition may occur, or the duration of AstraZeneca's patents' exclusivity. It leaves the patent bargain intact: AstraZeneca alone may make and sell its patented products. The Act affects a subset of sales, and not the existence or scope of the patent as an 'exclusive' right."

*Lopez*, 2026 WL 497141, at *17 (citation omitted). Here, too, AstraZeneca fails to allege that S.B. 71 has any impact on AstraZeneca's patent rights. Moreover, S.B. 71 does not cap the price of patented drugs; rather, "[t]he 340B program is what determines and sets the discounts on those drugs." *Bailey*, 2025 WL 595189, at *3. Thus, S.B. 71 has no direct impact on patent rights. AstraZeneca's allegations merely state that S.B. 71 could indirectly cause AstraZeneca to make less money selling patented drugs through S.B. 71's requirement that it distribute its Section 340B discounted drugs—both patented and unpatented—to unlimited contract pharmacies. Docket No. 22 at 32, ¶ 98. But patent law "does not police profit margins or insulate patentees from downstream financial effects of regulation." *Lopez*, 2026 WL 497141, at *17 (citing *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 451 (2015)). Thus, while S.B. 71 might incidentally lead to AstraZeneca losing some profit from selling patented drugs, AstraZeneca has not plausibly alleged that S.B. 71 conflicts with the protections of federal patent laws.[6] Therefore, AstraZeneca has not plausibly alleged that S.B. 71 is preempted by federal patent laws.

### C. <u>Contract Clause</u>

Defendants argue that plaintiff's Contract Clause claim should be dismissed. Docket No. 61 at 16-18. The Contract Clause provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. "Although the language of the Contract Clause is facially absolute, its prohibition must

[6] AstraZeneca argues that patent laws can be preempted when they regulate both patented and unpatented goods. Docket No. 69 at 16. But this misses the point; S.B. 71 does not conflict with federal patent laws because it does not conflict with the protections created by federal patent laws, not because it regulates both patented and unpatented goods.

be accommodated to the inherent police power of the State to safeguard the vital interests of its people." *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 410 (1983) (internal quotation and citation omitted). Examination of whether a statute violates the Contract Clause is a three-step inquiry. "The threshold inquiry is whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." *Id.* at 411 (internal quotations and citations omitted). "If the state regulation constitutes a substantial impairment, the State, in justification, must have a significant and legitimate public purpose behind the regulation . . . such as the remedying of a broad and general social or economic problem." *Id.* at 411-12 (citations omitted). "Once a legitimate public purpose has been identified, the next inquiry is whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption." *Id.* at 412 (internal quotations, alterations, and citation omitted).

Defendants argue that AstraZeneca's claim fails at the threshold inquiry because S.B. 71 does not substantially impair a contractual relationship. Docket No. 61 at 16-17. As explained in the background section of this order, drug manufacturers opt into the Section 340B program by signing a PPA, which are uniform agreements to comply with the requirements of Section 340B. AstraZeneca argues that S.B. 71 substantially impairs AstraZeneca's relationship with HHS by creating new obligations when participating in Section 340B, thus undermining the bargain reflected in the PPA. Docket No. 69 at 19. But PPAs merely "incorporate [Section 340B's] statutory obligations and record the manufacturers' agreement to abide by them. The form

agreements . . . contain no negotiable terms." *Astra*, 563 U.S. at 118. Thus, because Section 340B is silent as to how covered drugs are to be distributed, *Johnson*, 102 F.4th at 456-57, the PPAs are silent as to this matter as well. *Murrill*, 2024 WL 4361597, at *12 ("like [Section 340B], the PPA is silent as to delivery to or acquisition of Section 340B drugs to contract pharmacies."). Thus, S.B. 71 does not undermine the bargain reflected in the PPA because it does impact any terms of the PPA.

Contrary to AstraZeneca's assertion, it is not a substantial impairment of the PPA that S.B. 71's requirement regarding delivery to unlimited contract pharmacies would impose a financial burden on AstraZeneca not otherwise contemplated by the PPA. "In determining the extent of the impairment, [courts] are to consider whether the industry the complaining party has entered has been regulated in the past." *Energy Reserves Group*, 459 U.S. at 411 (citation omitted). "The pharmaceutical drug industry has been heavily regulated at least since 1906." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 586 (2011) (citation omitted) (Breyer, J, dissenting). Thus, state regulations increasing the price of participation in Section 340B does not substantially impair AstraZeneca's contractual relationship, particularly when the regulations do not impact any of the PPA's terms. *See Murrill*, 2024 WL 4361597, at *13 ("Since AstraZeneca can reasonably expect regulation with respect to the sale of drugs and, especially with respect to its voluntary participation in federal benefit programs such as Medicaid and Medicare, its claim fails at the threshold question for proving a modern Contracts Clause violation.") (internal quotations and citations omitted).

AstraZeneca's arguments to the contrary are unpersuasive. AstraZeneca argues that its position is supported by *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234

(1978). Docket No. 69 at 20. AstraZeneca notes that, in *Spannaus*, the Supreme Court invalidated a law that imposed new obligations beyond what the company had already agreed to. *Id.* (citing *Spannaus*, 438 U.S. at 246-47). However, unlike S.B. 71, the state law in *Spannaus* "effectively changed the terms of the contract." *Murrill*, 2024 WL 4361597, at *12. Conversely, S.B. 71 leaves the terms of the PPA unaltered.

AstraZeneca also argues that defendants "cannot demonstrate – certainly not based on the pleadings alone – that [S.B. 71] does not substantially impair AstraZeneca's PPA; serves a significant and legitimate public purpose; or achieves such a purpose in an appropriately direct manner. Indeed, Contracts Clause claims do not solely present legal questions and are rarely, if ever, decided without discovery or a factual record." Docket No. 69 at 18. This argument is flawed for two reasons. One, it misstates the burden in this case—defendants have no burden to demonstrate that S.B. 71 does not substantially impair AstraZeneca's PPA. Rather, to survive a motion to dismiss, AstraZeneca must plausibly allege that S.B. 71 substantially impairs a contractual relationship, serves no significant and legitimate purpose, and achieves that purpose in an indirect manner. *Khalik*, 671 F.3d at 1190. Next, contrary to AstraZeneca's assertion, it is not unusual to resolve a Contracts Clause claim at the motion to dismiss stage. *See Daigle v. Eldorado Cmty. Improvement Ass'n, Inc.*, 2023 WL 3221089, at *3 (10th Cir. May 3, 2023) (affirming dismissal of a Contract Clause claim in a motion to dismiss); *Wildgrass Oil & Gas Comm. v. Colorado*, 447 F. Supp. 3d 1051, 1070-71 (D. Colo. 2020) (dismissing a Contracts Clause claim); *River N. Props., LLC v. City & Cnty. of Denver*, No. 13-cv-01410-CMA-CBS, 2014 WL 7437048, at *6-7 (D. Colo. Dec. 30, 2014) (same). In fact, a Contracts Clause claims challenging a

Missouri state law similar to S.B. 71 was dismissed on a motion to dismiss. *Pharm. Rsch. & Mfrs. of Am. v. Bailey*, 2025 WL 644281, at *6 (W.D. Mo. Feb. 27, 2025).

Accordingly, the Court finds that AstraZeneca has not plausibly alleged that S.B. 71 violates the Contract Clause.

**D. <u>Takings Clause</u>**

Defendants argue that AstraZeneca's Takings Clause claim should be dismissed because, among other reasons, AstraZeneca voluntarily participates in Section 340B. Docket No. 61 at 19. The Takings Clause of the Fifth Amendment states that private property shall not "be taken for public use, without just compensation." U.S. Const. amend V. The Takings Clause applies to federal governmental entities and, through the Fourteenth Amendment, to state and local governmental entities as well. *Chicago, B. & Q. R. Co v. City of Chicago*, 166 U.S. 226, 239-241 (1897). "As a general matter, a government taking may occur when the government 'physically acquires private property for a public use,' or where, 'rather than appropriate private property for itself or a third party,' the government 'instead imposes regulations that restrict an owner's ability to use his own property.'" *AbbVie, Inc.*, 811 F. Supp. 3d at 1281 (quoting *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147-48 (2021)). AstraZeneca bases its Takings Clause claim on the former, arguing that S.B. 71 takes AstraZeneca's property for private use. Docket No. 69. Courts have rejected this argument. *See Abbvie, Inc.*, 2026 WL 1678085, at *10-11; *Frey*, 2025 WL 2813787, at *14; *Bailey*, 2025 WL 644285, at *4; *Skrmetti*, 2025 WL 1805271, at *19-20; *Fitch*, 2024 WL 3503965, at *16-20; *Murrill*, 2024 WL 4361597, at *13-15.

"[A] long line of cases instructs that no taking occurs where a person or entity voluntarily participates in a regulated program or activity." *Baker Cnty. Med. Servs., Inc.*

*v. U.S. Atty. Gen.*, 763 F.3d 1274, 1276 (11th Cir. 2014) (collecting cases); *Bailey*, 2025 WL 644285 ("When an entity voluntarily participates in a federal program, it forecloses the possibility that the statute could result in an imposed taking of private property which would give rise to the constitutional right of just compensation.") (citation omitted). This is true even when there is a "strong financial inducement" to participate in a government program, such as with Medicaid. *Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Welfare*, 742 F.2d 442, 446 (8th Cir. 1984). Therefore, defendants argue that AstraZeneca's voluntary participation in Section 340B forecloses its Takings Clause claim. Docket No. 61 at 19. AstraZeneca responds by arguing that "the voluntary-participation line of cases is inapplicable here" because "AstraZeneca has agreed with the federal government to participate in the 340B program; it did not agree with Colorado to participate in the program, nor to assume the burdens imposed by SB 71." Docket No. 69 at 24 (emphasis omitted).

While S.B. 71 does impose new requirements on Section 340B participants, participation in Section 340B nevertheless remains voluntary. And caselaw suggests that new state-imposed requirements on a voluntary federal program does not constitute a taking. In *Minn. Ass'n of Health Care Facilities*, 742 F.2d at 445-46, the Eighth Circuit analyzed a Minnesota law that limited the fees nursing homes voluntarily participating in Medicaid could charge non-Medicaid patients. Although the Minnesota law imposed an additional financial burden on Medicaid participants, the court noted that participation in Medicaid was nevertheless voluntary. *Id.* The court held that "[t]his voluntariness forecloses the possibility that the statute could result in an imposed taking of private property which would give rise to the constitutional right of just compensation."

*Id.* at 446. Therefore, like another court in this district, *see Abbvie , Inc.*, 2026 WL 1678085, at *11, the Court finds that AstraZeneca's voluntary participation in Section 340B forecloses its Takings Clause claim.[7]

### E. Dismissal with Prejudice

AstraZeneca does not seek leave to further amend its complaint. A district court may dismiss claims without granting leave to amend "when it would be futile to allow the plaintiff an opportunity to amend his complaint." *Brereton*, 434 F.3d at 1219. The Court finds that AstraZeneca could not allege additional facts that would cure the legal deficiencies identified in this order. Therefore, the Court will dismiss AstraZeneca's claims for relief with prejudice. *See Abbvie, Inc.*, 2026 WL 1678085, at *13 (dismissing analogous claims challenging the constitutionality of S.B. 71 with prejudice).

## IV. CONCLUSION

Therefore, it is

**ORDERED** that Defendants' Motion to Dismiss [Docket No. 61] is **GRANTED**. It is further

**ORDERED** that AstraZeneca's claims for relief are **DISMISSED with prejudice**. It is further

[7] Several courts have also found such Takings Clause claims insufficient due to finding that S.B. 71 and other analogous state laws do not impose an obligation to transfer or sell drugs, but rather prevent drug manufacturers from refusing to interfere with covered entities' arrangements with contract pharmacies. *Abbvie , Inc.*, 2026 WL 1678085, at *10; *Skrmetti*, 2025 WL 1805271, at *19; *Murrill*, 180 F.4th at 763. Therefore, these laws do not constitute a taking because they "do[ ] not deprive [plaintiff] of anything to which § 340B entitles it . . .; rather, [they] appl[y] only *after* [covered entities] have purchased the discounted drugs and directed their delivery." *Murrill*, 180 F.4th at 763 (internal quotation and citation omitted).

**ORDERED** that this case is closed.

DATED August 31, 2026.

BY THE COURT:

PHILIP A. BRIMMER
United States District Judge